IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN H. BALSEWICZ, a.k.a
MELISSA BALSEWICZ,

                Plaintiff,                    OPINION AND ORDER

    v.

                                                               19-cv-806-wmc

KEVIN KALLAS and
CYNTHIA OSBORNE,

                Defendants.

---

*Pro se* plaintiff John Balsewicz, also known as Melissa Balsewicz, is a transgender inmate at Kettle Moraine Correctional Institution.[1] She alleges that (1) defendants Kevin Kallas and Cynthia Osborne unconstitutionally deferred her hormone treatment and (2) Kallas did so because of Balsewicz's lawsuits against various Department of Corrections staff.[2] The parties filed cross-motions for summary judgment. (Dkt. ##36, 40, 45.) For the following reasons, the court will grant defendants' motions for summary judgment and dismiss this case.

---

[1] Balsewicz is a transgender woman. Accordingly, per her preference, the court uses female pronouns in referring to Balsewicz.

[2] At various points in her summary judgment briefing, Balsewicz appears to be pursuing a *Monell*-type claim against defendants, by contending that the named defendants were following an unwritten policy or practice of denying or delaying treatment for transgender inmates, and by claiming that her psychotherapy treatment at Waupun Correctional Institution was inadequate due to staffing shortages. (Dkt. #37 at 16-20.) However, the court will not address those claims, given that Balsewicz was not granted leave to proceed on any such claims, and even if she could state them, it is far too late to introduce those claims now. *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (a plaintiff may not amend her complaint through a summary judgment brief).

UNDISPUTED FACTS[3]

Balsewicz has been diagnosed with gender dysphoria, depression, and personality disorders. At all times relevant to this case, she was incarcerated either at Waupun Correctional Institution or at the Wisconsin Resource Center ("WRC"), which is a facility that treats inmates who need specialized mental health services.

### A. WPATH standards of care for gender dysphoria

The World Professional Association for Transgender Health ("WPATH") publishes its *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (7th ed. 2012) to provide guidance to health professionals in the treatment of individuals with gender identity issues. These are authoritative standards of care for treating gender dysphoria, a "field of medicine [that] is evolving." (Dkt. #43-1 at 47.) The WPATH standards recognize that hormone therapy "is a medically necessary intervention for many . . . individuals with gender dysphoria," but caution that treatment must be individualized based on the individual's goals and other medications and medical conditions, as well as social and economic issues. (*Id.* at 39-40.)

Accordingly, the WPATH standards guide treatment decisions by recommending "flexible clinical guidelines" that a patient should meet before receiving some types of treatment, which are referred to as "criteria." (*Id.* at 8.) The criteria for hormone therapy are:

---

[3] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying record as appropriate.

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

(*Id.* at 40.) In particular, although "the presence of coexisting mental health concerns does not necessarily preclude access to . . . hormones . . . these concerns need to be managed prior to, or concurrent with, treatment of gender dysphoria." (*Id.*)

The WPATH standards explicitly state that they apply "in their entirety" to institutionalized transgender individuals, including inmates. (*Id.* at 73.) The WPATH standards also explain that clinical departures from the criteria may be justified by "a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies." (*Id.* at 8.)

### B. Balsewicz's gender dysphoria diagnosis and treatment

Wisconsin Department of Corrections ("DOC") policy for treating gender dysphoria and accommodating transgender inmates is managed by its "Transgender Committee," whose purpose includes evaluating requests for treatment for gender dysphoria and accommodations for transgender inmates. (Dkt. #48-3 at 2-3, 6.) Defendant Kallas is the DOC's Mental Health Director and a committee member. Kallas

3

oversees mental health care within the DOC, but generally does not provide direct, clinical treatment to inmates.

Specifically, if an inmate requests transgender services (such as hormone therapy), a psychological services staff member conducts an in-person assessment and writes a report about the inmate's gender issues. Mental Health Director Kallas then reviews the report and decides whether to refer the inmate for further assessment by the DOC's transgender consultant, defendant Cynthia Osborne. Osborne's evaluation of an inmate includes review of relevant psychiatric records, pre-sentence investigations, and prison incident reports, as well as a meeting with the inmate. Osborne does not order treatment for an inmate, but rather prepares a written report with her recommendation for treatment, which Kallas then reviews and relies on in making treatment decisions.

In early April 2016, while plaintiff Balsewicz was incarcerated at Waupun, she underwent a gender dysphoria assessment after requesting hormone therapy and gender confirmation surgery. The psychological associate who conducted the initial assessment gave Balsewicz a provisional diagnosis of gender dysphoria. That assessment, along with a 2012 psychological assessment, was forwarded to Kallas in late September 2016, after Balsewicz was admitted to the WRC for depression.[4] Kallas reviewed the assessments and advised the WRC's clinical director that Balsewicz was an appropriate candidate to see Osborne for further evaluation. Kallas questioned whether "a GD diagnosis [was] firmly established," and wanted "to be cautious and move slowly with any significant treatment

---

[4] The delay in forwarding the report to Kallas was litigated in a separate lawsuit. *Balsewicz v. Blumer*, No. 17-cv-360-JPS, 2019 WL 1370105, at *1 (E.D. Wis. March 26, 2019), *aff'd*, 788 F. App'x 379 (7th Cir. 2019).

4

interventions like hormones" given Balsewicz's "psychiatric history." (Dkt. #43-3 at 1.) Still, Kallas recommended placement in a "GD facility." (*Id.*) Balsewicz was next placed on the list to see Osborne, who was not available until early 2017. While at the WRC, Balsewicz expressed frustration that her treatment was not more focused on gender dysphoria. She also apparently attempted suicide three times in December 2016.

Osborne evaluated Balsewicz in February 2017 and confirmed the diagnosis of gender dysphoria. However, she recommended in a 26-page assessment that the DOC defer consideration of hormone therapy for at least a year due to Balsewicz's psychological and behavioral instability at the time. Specifically, Osborne concluded that Balsewicz's comorbid psychiatric disorders, including depression and personality disorders, were poorly managed, as was her chronic suicidal ideation. Even more specifically, Osbourne observed that Balsewicz's depressive symptoms had intensified despite her disclosing and seeking treatment for gender dysphoria, in part because Balsewicz feared that her family would not accept her. In addition, Osborne noted that Balsewicz had been described by WRC staff as uncooperative and noncompliant with treatment efforts. Staff also observed that Balsewicz seemed principally, if not solely, "motivated to complain, and as litigious in [her] attitude–looking for opportunities to file a lawsuit, for example." (Dkt. #43-4 at 10.)

When Osborne actually interviewed Balsewicz, she was in segregation "due to threats made toward staff," which she denied; had already been removed from DBT therapy altogether; and was waiting to be transferred out of the WRC. (*Id.* at 8, 21.) With this in mind, Osborne explained that "[f]eminization without psychological stability may produce disappointing outcomes," which was "a critical point when assessing incarcerated

5

individuals." (*Id.* at 21.) Osborne further recommended that Balsewicz focus on learning positive coping skills, and that she be allowed access to the usual accommodations available to other gender dysphoric inmates, including hygienic items and female undergarments while she reengaged in her psychiatric treatment.

In turn, as the mental health director, Kallas adopted Osborne's recommendation, recommending that Balsewicz be transferred to a facility that could accommodate a transgender inmate. He also claims to have told Balsewicz's treating clinician that she was approved to have certain lifestyle accommodations. While Balsewicz disputes the latter, noting that she had to file an inmate grievance at Waupun in late March 2017 asking for female undergarments (dkt. #39-1 at 313), there is no dispute that Balsewicz had female undergarments, as well as certain hygiene items, by the time Osborne reevaluated her in April 2018.

In fairness, while waiting to be reevaluated over the next year, Balsewicz's mental health treatment was somewhat inconsistent (due in part to staff turnover), but she did see mental health providers ten times in 2017 and three times in 2018 before beginning hormone therapy. In January 2018, Osborne recommended that Balsewicz be reevaluated. Osborne further noted in an email to Kallas that Balsewicz "may have filed some lawsuits, which doesn't create a great context for treatment"; Osborne also acknowledged that Balsewicz had not been in regular psychotherapy due to staff shortages. (Dkt. #48-5 at 1.) Further, Kallas engaged in a short email exchange with a former DOC psychologist, who requested some old emails about Balsewicz's evaluation, noting that Balsewicz had filed a lawsuit against him. (Dkt. #39-1 at 182.)

Osborne interviewed Balsewicz again in April 2018, during which Balsewicz told Osborne that the initial report accurately and fairly represented her history. In Osborne's follow-up report, she further observed that Balsewicz had "made an effort over the year to better manage [her] maladaptive impulses," such as threats of suicide or self-harm, fighting with other inmates, or engaging in behaviors that resulted in segregation. (Dkt. #43-5 at 3.) However, Osborne noted that Balsewicz still displayed maladaptive personality traits, and observed that just six days after the interview, Balsewicz was again placed in segregation for fighting with another inmate and "expressing the idea that assaulting staff would likely lead to [her] transfer to another institution, which [she] apparently desires." (*Id.*) Osborne further acknowledged that hormone treatment can have a positive impact on comorbid psychiatric problems, but "does not cure personality disorders." (*Id.* at 5.) She also noted that Balsewicz had filed two civil lawsuits and had served more than 27 years of her life sentence.[5]

Still, because Balsewicz met the diagnostic criteria for gender dysphoria, had been persistently seeking treatment, and faced a long incarceration, Osborne concluded that starting hormone therapy would be "reasonable" now *provided*: that treatment expectations were modest; *and* Balsewicz first showed a commitment "to learning to manage [her] maladaptive impulses in more mature and prosocial ways . . . if [she] hopes to initiate and

---

[5] Publicly available court records show that Balsewicz pursued two lawsuits in the Eastern District of Wisconsin, but they were against neither Kallas nor Osborne. In one case, Balsewicz claimed correctional officers failed to protect her from an attack by another inmate; and in the other, she contended that medical staff were deliberately indifferent to her risk of self-harm and failed to transmit her gender dysphoria diagnosis promptly to the appropriate committee for treatment. *See Balsewicz v. Blumer*, No. 17-cv-360-jps (E.D. Wis. 2017); *Balsewicz v. Pawlyk*, No. 18-cv-97-jps (E.D. Wis. 2018).

be maintained on hormones." (*Id.*) Kallas received this second report from Osborne in May 2018, he decided to place Balsewicz's file on "follow-up status" for review later that summer in light of Osborne's conditional recommendation, and Balsewicz's recent segregation placement. (Dkt. #43 at 8.)

At the end of August 2018, Kallas next asked for an update on Balsewicz's "institutional adjustment and level of cooperation with providers" at Waupun. (Dkt. #43-6 at 2.) Balsewicz's new clinician told Kallas that he had "grudgingly agreed to work with" her and did not see any reason to continue withholding hormone therapy. (Dkt. #43-7 at 1.) Kallas then referred Balsewicz for hormone therapy, which began on September 17, 2018.

That same day, Kallas also sent Balsewicz a letter in response to her complaints about the delay in starting hormone therapy. Kallas explained that the delay was his decision, and that he had decided to place Balsewicz's file on follow-up status because she "had continued to express [her] needs in maladaptive ways, including aggression and threats of harm to self and others." (Dkt. #43-8 at 2.) Kallas further explained that he had decided to refer Balsewicz for hormone therapy now based on her "current institutional adjustment and level of cooperation with providers." (*Id.*)

OPINION

In violation of the Eighth and First Amendments, plaintiff claims that: (1) both defendants Kallas and Osborne acted with deliberate indifference to her gender dysphoria

8

by deferring her hormone treatment; and (2) defendant Kallas acted in retaliation for plaintiff's lawsuits. Defendants seek summary judgment on the merits of both claims.[6]

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). After considering the parties' arguments, their proposed findings of fact, and the evidence of record, as well as the current, unsettled state of the law with respect to plaintiff's need for immediate hormone therapy for gender dysphoria, the court is compelled to grant summary judgment in defendants' favor.

## I. Deferral of hormone therapy

Plaintiff principally claims deliberate indifference as evidenced by the fact that her hormone therapy was deferred for over a year, allegedly for nonmedical reasons. Certainly, the states have an affirmative duty to provide medical care to their inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To succeed on an Eighth Amendment medical care claim, however, a plaintiff must show (1) an objectively serious medical condition to which

---

[6] Kallas alternatively claims entitlement to qualified immunity, arguing that (1) he "acted well within the medical standard of care for treating gender dysphoria" and (2) plaintiff "cannot point to a case showing more was required of [him]." (Dkt. #41 at 20.) The court does not need to reach that issue because the court concludes that Kallas is entitled to summary judgment on the merits.

(2) a state official was deliberately, that is subjectively, indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). Since there is no dispute that gender dysphoria is a serious medical need, *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011), the primary issue is whether defendants' response in this case constituted deliberate indifference.

Deliberate indifference is considered a "high standard" to meet, requiring more than mere medical malpractice. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.") For this reason, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). While deliberate indifference requires more than negligent acts, it also requires something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id*. at 837. A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'")).

As an initial matter, Osborne argues that she was not sufficiently involved in the decision to defer hormone therapy because she was not the decision-maker. "For a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). That requirement "is satisfied if the constitutional violation occurs at a defendant's direction or with her knowledge or consent." *Id.* In this case, Osborne could not order hormone therapy, did not decide whether or when plaintiff could begin hormone therapy, and was not a member of the Transgender Committee. However, she did evaluate plaintiff for gender dysphoria and made treatment recommendations that influenced Kallas's treatment decisions. *See id.* at 499 (psychological services supervisor was not sufficiently involved in the decision to deny plaintiff hormone treatment in part because she could not "have influenced the Committee's final decision").

Even so, the record is insufficient for a reasonable jury to find deliberate indifference on Osborne's or Kallas's part. Plaintiff maintains that she should have started hormone therapy right away because such treatment is deemed medically necessary under WPATH standards. Plaintiff also argues that her comorbid mental health conditions were only tied to her gender dysphoria, and that hormone therapy was not going to "cure" her of those conditions, so those comorbidities were no reason to defer treatment. Finally, plaintiff contends that defendants inappropriately considered her disciplinary record and lawsuits in evaluating her treatment request.

Plaintiff's lay opinion about her treatment plan is insufficient to establish an absence of professional judgment on Osborne's or Dr. Kallas's part in deferring hormone

11

therapy until plaintiff demonstrated increased psychological stability. *See Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded [a] need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances."); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to establish deliberate indifference).

Osborne adequately explained in her initial report how she applied the WPATH standards to plaintiff's case *and* why she recommended that plaintiff's mental health needs come first. As plaintiff concedes, those standards advise that while hormone therapy is a "medically necessary intervention for many" individuals with gender dysphoria (dkt. #43-1 at 39), that treatment "must be individualized." (*Id.* at 40.) WPATH criteria for hormone therapy include persistent, well-documented gender dysphoria and reasonably well-controlled significant mental health concerns. In keeping with these criteria, Osborne adequately explains in her initial report why plaintiff's "comorbid psychiatric conditions should be effectively addressed" before or during hormone therapy, especially when significant psychological instability can prevent an individual from being able to engage cooperatively with providers or to comply with recommended treatment. (Dkt. #43-4 at 20-21.)

Moreover, when Osborne first became involved, plaintiff had only recently disclosed her dysphoria and had been receiving intensive therapy for both depression and suicidal ideation at the WRC. Thus, Osborne reasonably considered plaintiff's psychological and

behavioral stability, noting that she had made recent, suicide attempts, had failed to cooperate in her mental health treatment for depression, and had not shown a willingness to use learned coping skills. At that point, it was unclear to Osborne to what extent plaintiff's existing mental health conditions were related to, much less the cause of, her gender dysphoria, especially given Osborne's observation that plaintiff's "depressive symptoms had intensified" even though she simultaneously reported feeling better since seeking treatment. (*Id.* at 19.) Accordingly, on this record, Osborne advised seeking a more sustained resolution of symptoms, including suicidality, before beginning hormone therapy.

While plaintiff now argues that her mental health conditions were not significant because Osborne eventually found plaintiff competent to make her own treatment decisions, plaintiff admits that she *was* suicidal in the months leading up to her initial evaluation. And while Osborne also observed that plaintiff had been described by staff as recently "litigious in [her] attitude" (*id.* at 10), this was one of many considerations in Osborne's comprehensive evaluation. Taking all of this evidence into account, a reasonable jury would be compelled to conclude that Osborne's recommendation of deferral ultimately rested at least in substantial part on plaintiff's "poorly managed comorbid disorders and active suicidality," not on plaintiff's disciplinary record, lawsuits or other unrelated matter. (*Id.* at 24.)

Similarly, the evidence shows that Mental Health Director Kallas had been legitimately concerned with plaintiff's significant psychiatric history and with the fact that her GD diagnosis was recent. Plaintiff was allowed certain lifestyle accommodations to

13

relieve her dysphoria as she worked towards psychological stability, but Kallas reasonably wanted to proceed cautiously with significant treatment interventions like hormone therapy. *See Campbell v. Kallas*, 936 F.3d 536, 549 (7th Cir. 2019) (noting the "difference between a complete denial of care and context-specific judgment calls"). Regardless, plaintiff has not put forth evidence beyond her own opinions that Osborne's approach or Kallas's adoption of it was so "out of line with prevailing professional norms" as to constitute a lack of medical judgment. *See Norfleet*, 439 F.3d at 396 (deliberate indifference can be inferred when treatment decisions are "so far afield of accepted professional standards that no inference can be drawn that the decisions were actually based on medical judgment"). Quite to the contrary, defendants appear to have acted well within the margins of accepted medical treatment, or so a reasonable trier of fact would have to find on this record.

      That the delay in starting hormone therapy understandably caused plaintiff distress does not mean that Kallas or Osborne recklessly disregarded plaintiff's medical need. Indeed, after Osborne's initial evaluation, Kallas recommended that plaintiff be placed in an institution approved for transgender inmates where her stability improved. And plaintiff does not offer any evidence of additional suicide or self-harm attempts while waiting to begin hormone therapy. (*See* dkt. #39-1 at 17-31.) Similarly, plaintiff argues that staffing shortages affected her psychotherapy after returning to Waupun, but offers no evidence that defendants held staffing shortages against her. To the contrary, in re-evaluating plaintiff in 2018, Osborne acknowledged that plaintiff should not be punished for that problem. And while Osborne noted that plaintiff had filed two lawsuits, she

14

actually opined that given the length of plaintiff's incarceration, persistence in seeking treatment, and her improved stability, were all reasons for her to *begin* hormone therapy.

Of course, Osborne also remained concerned about plaintiff's display of therapy-interfering behaviors. Thus, she cautioned that plaintiff still displayed maladaptive impulses and that success would depend on plaintiff's cooperation with providers. So, too, when plaintiff returned to segregation after engaging in an altercation with another inmate and threatening staff, Osborne took this as a sign of renewed instability, which also amplified Kallas's longstanding concerns. However, there is no evidence that Osborne and Kallas required perfect behavior from plaintiff. To the contrary, Kallas referred plaintiff for hormone therapy just four months later, after the summer passed without further incident and her new clinician confirmed that plaintiff was willing to work with her. (Dkt. #43-7 at 1.) Plaintiff's suspicion that Kallas harbored other, inappropriate reasons for deferring hormone treatment, including lawsuits, rests on speculation about Kallas's motive, not evidence of it.[7] *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[i]t is well-settled that speculation may not be used to manufacture a genuine issue of fact").

---

[7] Plaintiff suggests in her briefing that Osborne is biased in her evaluations of transgender inmates in favor of her employers and seeks ways to circumvent the WPATH standards. (Dkt. ##37 at 17-18, 61 at 4, 73 at 5.) In support, plaintiff relies on cases in which Osborne conducted a peer review of a colleague's evaluation of a transgender inmate, *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014), and provided an expert opinion, *Konitzer v. Frank*, 711 F. Supp. 2d 874 (E.D. Wis. 2010), as well as on a case referencing Osborne's proposed additional criteria for gender confirmation surgery as "in opposition to the WPATH Standards of Care," *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1126 (D. Idaho 2018), *aff'd in part sub nom. Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019). The question for this court, however, is whether a reasonable juror could conclude that Osborne's alleged conduct *in this case* constitutes deliberate indifference.

In the end, plaintiff maintains that she should have been started on hormone therapy immediately and strongly disagrees with how Osborne and Kallas exercised their professional judgment in providing care in her case. However, plaintiff's opinions are not evidence from which a reasonable jury could conclude that "no minimally competent medical professional" would have recommended deferring or deferred her hormone therapy given her poorly controlled psychological and behavioral instability. *Campbell*, 936 F.3d at 548; *see Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 660 (7th Cir. 2021) ("A negligent exercise of medical judgment is not enough to show deliberate indifference. Plaintiff must show a failure to exercise medical judgment at all."). The court will not substitute its or plaintiff's conclusions for defendants' clinical judgments in a new and evolving area of medical practice. Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims.

## II. Retaliation for filing lawsuits

This leaves plaintiff's claim that defendant Kallas deferred her hormone treatment in retaliation for plaintiff's prior lawsuits. Filing a lawsuit is a protected activity under the First Amendment, and Kallas does not claim he was unaware of plaintiff's cases. *See Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996) (inmates have a First Amendment right "to seek administrative or judicial remedies of conditions of confinement"); *Zorzi v. Cnty. of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994) ("Retaliation for filing a lawsuit is prohibited by the First Amendment's protection of free speech."). Instead, Kallas represents that at the time he made his treatment decisions regarding plaintiff, he was concerned with her psychiatric history and demonstrated unwillingness to cooperate with providers.

16

Although Osborne observed that plaintiff had been described by staff as litigious and had filed two lawsuits, as well as inquired about them, the only evidence of retaliation that plaintiff actually presents is her own suspicions based on the fact that Kallas reviewed and adopted most of Osborne's recommendations. However, this is not enough to establish retaliatory motive. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("a suspicion is not enough to get past a motion for summary judgment"). Nothing in the record reflects that Kallas's decisions regarding plaintiff's hormone therapy were tainted by malice or animosity stemming from prior lawsuits. Without more, Kallas is entitled to summary judgment on plaintiff's retaliation claim as well.

## ORDER

IT IS ORDERED that:

1) Plaintiff's motion for summary judgment (dkt. #36) is DENIED.

2) Defendants' motions for summary judgment (dkt. ##40, 45) are GRANTED.

3) Defendant Kallas's motion to stay deadlines (dkt. #74) is DENIED AS MOOT.

4) The clerk of court is directed to enter judgment for defendants and to close this case.

Entered this 8th day of December, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge